JAMES E. LYONS (State Bar No. 112582)
THOMAS E. STEVENS (State Bar No. 168362)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 984-6400
Facsimile: (415) 984-2698

GARRETT J. WALTZER (State Bar No. 130764)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

Attorneys for Defendants
Eric C. Brewer, Greg Myers, David C.
Peterschmidt and Inktomi Corporation

ORIGINAL
FILED
JAN 30 2003
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

E-filing

SAN FRANCISCO DIVISION

| | |
|---|---|
| LEON MALACHINSKI, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID C. PETERSCHMIDT, ERIC A. BREWER, FRANK C. GILL, GREG MYERS, ALAN F. SHUGART and INKTOMI CORPORATION,<br><br>Defendants. | Case No. C03 00402 PJH<br><br>San Mateo Superior Court Case No.: CIV 428824<br><br>**NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. § 1441(a)** |

PLEASE TAKE NOTICE that defendants Eric A. Brewer, Greg Myers, David C. Peterschmidt and Inktomi Corporation hereby remove to this Court the state court action described below:

1. On January 24, 2003, a civil action was commenced in the Superior Court of California for the County of San Mateo, entitled *Leon Malachinski, On Behalf of Himself and All Others Similarly Situated vs. David C. Peterschmidt, et al.*, Case No. CIV 428824. A true and correct copy of the Summons and Complaint served on Inktomi is attached hereto as Exhibit

A. The Complaint, together with a Notice of Case Management Conference, a true and correct copy of which is attached hereto as Exhibit B, constitute all process, pleadings and orders served upon defendants in this action to date.

2. This is a civil action of which this Court has original jurisdiction under 28 U.S.C. section 1331, and is one which may be removed to this Court by defendants pursuant to the provisions of 28 U.S.C. section 1441(a).

3. This action has been removed to the Northern District of California, San Francisco Division pursuant to Northern District Local Rule 3-2(c) and the Court's Assignment Plan, embodied in General Order 44 ¶ (D)(2)(5), which provides that venue for cases involving Securities Class Actions "shall be proper in any Courthouse in this District."

4. The Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb ("SLUSA"), provides that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

5. The Complaint in this case asserts claims on behalf of a putative class of stockholders of Inktomi Corporation ("Inktomi") on account of purported breaches of fiduciary duty by the individual defendants, including, *inter alia,* the duty of candor owed to the public shareholders of Inktomi in connection with the adoption of a merger agreement between Inktomi and Yahoo! Inc., and the public statements of Inktomi relating thereto.

6. The Complaint constitutes a "covered class action" pursuant to 15 U.S.C. section 78bb(f)(5)(B). Under SLUSA, "[a]ny covered class action brought in any State court involving a covered security . . . shall be removable to the Federal district court for the district in which the action is pending. . . ." 15 U.S.C. § 78bb(f)(2). The Complaint does not contain any allegations that would bring this matter within any of the exceptions contained in 15 U.S.C. section 78bb(f)(3). Thus, this action is removable to federal court.

7. Defendants Brewer, Myers, Peterschmidt and Inktomi became aware of the filing of the Complaint on or about Tuesday, January 28, 2003. This notice of removal is being filed less than thirty days after such defendants' receipt of the Complaint, as required by 28 U.S.C. section 1446(b). Defendants Frank C. Gill and Alan F. Shugart are former directors of Inktomi who did not serve on Inktomi's Board of Directors when the merger agreement with Yahoo! Inc. was approved and who, on information and belief, have not been served with process.

8. Accordingly, all of the requirements of 28 U.S.C. section 1331 are met by this notice and this action may properly be removed to this Court pursuant to 28 U.S.C. section 1441(a).

Dated: January 30, 2003

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: ______________________
Garrett J. Waltzer

Attorneys for Defendants
Eric C. Brewer, Greg Myers, David C. Peterschmidt and
Inktomi Corporation

Exhibit A

SUMMONS
(CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

NOTICE TO DEFENDANT: *(Aviso a Acusado)*
DAVID C. PETERSCHMIDT, ERIC A. BREWER,
FRANK C. GILL, GREG MYERS, ALAN F. SHUGART
and INKTOMI CORPORATION,

YOU ARE BEING SUED BY PLAINTIFF:
*(A Ud. le está demandando)*
LEON MALACHINSKI, On Behalf of Himself And
All Others Similarly Situated,

You have *30 CALENDAR DAYS* after this summons is served on you to file a typewritten response at this court.

A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.

If you do not file your response on time, you may lose the case, and your wages, money and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

*Después de que le entreguen esta citación judicial usted tiene un plazo de 30 DIAS CALENDARIOS para presentar una respuesta escrita a máquina en esta corte.*

*Una carta o una llamada telefónica no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.*

*Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosas de su propiedad sin aviso adicional por parte de la corte.*

*Existen otros requisitos legales. Puede que usted quiera llamar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico).*

The name and address of the court is: *(El nombre y dirección de la corte es)*

CASE NUMBER: *(Número del Caso)*
CIV 428824

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN MATEO
400 County Center
Redwood City, CA 94063

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*

Michael D. Braun (167416)
Timothy J. Burke (181866)
STULL, STULL & BRODY
10940 Wilshire Blvd., Suite 2300
Los Angeles, CA 90024

Tel.: (310) 209-2468
Fax: (310) 209-2087

DATE: *(Fecha)* JAN 27 2003 ~~James M. Dempsey~~ PEGGY THOMPSON Clerk, by *(Actuario)* M. MARLOWE, Deputy *(Delegado)*

(SEAL)

NOTICE TO THE PERSON SERVED: You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Inktomi Corporation

under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (individual)
☐ other:

4. ☐ by personal delivery on *(date)*:

Michael D. Braun (167416)
Timothy J. Burke (181866)
STULL, STULL & BRODY
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468
Fax: (310) 209-2087

Richard B. Brualdi
Kevin T. O'Brien
THE BRUALDI LAW FIRM
29 Broadway
Suite 1515
New York, New York 10006
Tel: (212) 952-0602
Fax: (212) 952-0608

Attorneys for Plaintiff

ENDORSED FILED
SAN MATEO COUNTY
JAN 24 2003
Clerk of the Superior Court
By M. MARLOWE
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

LEONMALACHINSKI, On Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

DAVID C. PETERSCHMIDT, ERIC A. BREWER, FRANK C. GILL, GREG MYERS, ALAN F. SHUGART and INKTOMI CORPORATION,

Defendants.

FILE VIA FAX

CASE NO. CIV 428624

CLASS ACTION

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, FAILURE TO DISCLOSE AND INDEMNIFICATION

JURY TRIAL DEMANDED

Plaintiff, as and for his Shareholder Class Action Complaint, alleges as follows based upon personal knowledge as to himself and his own acts, and upon information and belief derived from, *inter alia*, a review of documents filed with the Securities and Exchange Commission ("SEC") and other publicly available sources as to all other matters:

## NATURE OF THE ACTION

1. This is a shareholder class action on behalf of the stockholders of Inktomi Corporation ("Inktomi" or the "Company") against Inktomi's directors which seeks, *inter alia*, to enjoin defendants' actions related to the sale of Inktomi to Yahoo, Inc. ("Yahoo") for $1.65 per share pursuant to a "cash out" merger agreement dated December 22, 2002 (the "Merger Agreement") without making full and adequate disclosures, and to obtain other appropriate relief.

2. Plaintiff alleges that defendants have directly or by conspiracy or by aiding and abetting one another violated their fiduciary duties of loyalty and/or due care to Inktomi's shareholders in that they, *inter alia*: (1) caused Inktomi to retain an investment advisor, Thomas Weisel Partners ("Thomas Weisel"), which has a conflict of interest because it has significant business ties to Yahoo; (2) voted to cause Inktomi to enter the Merger Agreement notwithstanding the unfair price offered and without regard for the interests of Inktomi's public shareholders because they themselves will profit from the sale to Yahoo; and (3) have not made full and adequate disclosure to Inktomi's shareholders. Plaintiff alleges that had defendants complied with their fiduciary duties, they would have: (1) not agreed to sell Inktomi at this time, would not have agreed to sell Inktomi to Yahoo or would have obtained a substantially higher price for Inktomi and its stockholders; and (2) would have disclosed all material information to plaintiff and other class members.

3. Further, if the Merger Agreement is consummated, each and every member of Inktomi's Board of Directors will receive compensation, in the form of indemnification for their acts or omissions, assumption of stock options, severance benefits and/or continued employment at Yahoo, beyond that received by Inktomi's public shareholders. Thus, every member of Inktomi's Board of Directors will financially benefit directly from selling Inktomi at this time and to Yahoo and each of them has a conflict of interest with respect to the actions challenged in this lawsuit.

## JURISDICTION

4. This court has jurisdiction over the subject matter of this action pursuant to the California Constitution, Article VI, Section 10, because this case is an action not given by statute to other trial courts.

5. This Court has jurisdiction over each of the defendants in this action because they conduct business in, reside in, or are citizens of, California.

6. Inktomi's principal place of business is located in this county, and defendants' wrongful acts arose in this county.

## PARTIES

7. Plaintiff, Leon Malachinski, owned shares of Inktomi common stock at all relevant times and continues to own such shares.

8. Defendant, Inktomi, is a Delaware corporation headquartered at 4100 East Third Avenue, Foster City, California 94404. The Company provides World Wide Web search services for Internet portal and search destination sites. Web search customers include Microsoft, Overture and HotBot. Other customers include Amazon, E-bay and WalMart.com

9. Defendant David C. Peterschmidt ("Peterschmidt") has served as President, Chief Executive Officer and a director of the Company since July 1996. Peterschmidt was appointed Chairman of the Board in December 1997. Peterschmidt will benefit from the Merger Agreement in a way that is not shared by all Inktomi shareholders because, pursuant to the Merger Agreement, he will be granted a right to indemnification for acts or omissions occurring prior to the consummation of the Merger Agreement and he holds options to purchase 5,100,800 shares of Inktomi common stock which, will either be assumed by Yahoo and converted into an option to acquire shares of Yahoo common stock or repurchased by the Company at cost. Thus, Peterschmidt, unlike Inktomi's public shareholders, will own an interest in Yahoo and will avoid the adverse capital gains tax consequences that Yahoo's public shareholders will suffer when their Inktomi shares are converted to cash. Further, Peterschmidt has entered into a Voting Agreement whereby he has agreed to vote his shares of Inktomi stock in favor of the Merger Agreement and is entitled to a severance payment estimated at $1.6 million if he is terminated without cause immediately following the merger.

10. Defendant Eric A. Brewer ("Brewer") has served as a director of Inktomi since its inception in February 1996. From February 1996 to December 1997, Brewer was Chief Technology Officer of Inktomi and was appointed Chief Scientist in December 1997. From May 1996 to July 1996, he served as interim President and Chief Executive Officer of Inktomi. Brewer will benefit from the Merger Agreement in a way that is not shared by all Inktomi shareholders because, pursuant to the Merger Agreement he will be granted a right to indemnification for acts or omissions occurring prior to the consummation of the Merger Agreement, he holds options to purchase 725,000 shares of Inktomi common stock which will either be assumed by Yahoo and converted into an option to acquire shares of Yahoo common stock or repurchased by the Company at cost. Thus, Brewer, unlike Inktomi's public shareholders, will own an interest in Yahoo and will avoid the adverse capital gains tax consequences that Yahoo's public shareholders will suffer when their Inktomi shares are converted to cash. Additionally, while it has been publicly reported that Brewer is expected to join Yahoo following completion of the merger and has entered into a Voting Agreement whereby he has agreed to votes his shares of Inktomi in favor of the Merger Agreement, Brewer is entitled to a severance payment estimated at $330,000 if he is terminated without cause immediately following the merger.

11. Defendant Frank C. Gill ("Gill") is a member of the Board of Directors of the Company and has been so since December 1998. Gill will benefit from the Merger Agreement in a way that is not shared by all Inktomi shareholders because, pursuant to the Merger Agreement, he will be granted a right to indemnification for acts or omissions occurring prior to the consummation of the Merger Agreement.

12. Defendant Greg Myers ("Myers") is a member of the Board of Directors of the Company and has been so at all relevant times. Myers will benefit from the Merger Agreement in a way that is not shared by all Inktomi shareholders because, pursuant to the Merger Agreement, he will be granted a right to indemnification for acts or omissions occurring prior to the consummation of the Merger Agreement and he holds options to purchase 200,000 shares of Inktomi common stock which will either be assumed by Yahoo and converted into an option to acquire shares of Yahoo common stock or repurchased by the Company at cost. Thus, Myers, unlike Inktomi's public shareholders, will own an

interest in Yahoo and will avoid the adverse capital gains tax consequences that Yahoo's public shareholders will suffer when their Inktomi shares are converted to cash.

13. Defendant Alan F. Shugart ("Shugart") is a member of the Board of Directors of the Company and has been so since December 1997. Shugart will benefit from the Merger Agreement in a way that is not shared by all Inktomi shareholders because, pursuant to the Merger Agreement, he will be granted a right to indemnification for acts or omissions occurring prior to the consummation of the Merger Agreement.

14. The defendants identified in paragraphs 9 through 13 collectively constitute the entirety of Inktomi's board of directors. These five individuals are hereinafter referred to as the "Individual Defendants."

15. By virtue of their positions as directors, and/or officers of Inktomi and/or their exercise of control and ownership over the business and corporate affairs of Inktomi, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause Inktomi to engage in the practices complained of herein. Each Individual Defendant owed and owes Inktomi and its shareholders fiduciary obligations and were and are required to: (1) use their ability to control and manage Inktomi in a fair, just and equitable manner; (2) act in furtherance of the best interests of Inktomi and its shareholders; (3) act to maximize shareholder value in connection with any change in ownership and control to the extent consistent with governing statutes; (4) govern Inktomi in such a manner as to heed the expressed views of its public shareholders; (5) refrain from abusing their positions of control; (6) not favor their own interests at the expense of Inktomi and its public shareholders; and (7) fully disclose all material events to Inktomi's public shareholders.

16. Each defendant herein is sued individually and/or as a conspirator and aider and abettor and in their capacity as directors of Inktomi. The liability of each defendant arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

///

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to California Code of Civil Procedure 382 on behalf of all Inktomi common stock holders. Excluded from the Class are defendants, Inktomi's directors and executive officers, members of the immediate families of the defendants and Inktomi's directors and executive officers, their heirs and assigns, and those in privity with them.

18. The members of the Class are so numerous that joinder of all of them would be impracticable. While the exact number of Class members is unknown to plaintiff, and can be ascertained only through appropriate discovery, plaintiff believes there are many hundreds, if not thousands, of Class members. Inktomi had 162,890,548 shares of common stock outstanding as of January 1, 2003.

19. Plaintiff's claims are typical of the claims of the Class, since plaintiff and the other members of the Class have and will sustain harm arising out of defendants' breaches of their fiduciary duties. Plaintiff does not have any interests that are adverse or antagonistic to those of the Class. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

20. There are questions of law and fact common to the members of the Class that predominate over any questions which, if they exist, may affect individual Class members. The predominant questions of law and fact include, among others, whether:

a. the defendants have and are breaching their fiduciary duties to the detriment of Inktomi shareholders;

b. plaintiff and the Class are entitled to an injunction and other equitable relief; and

c. plaintiff and the Class have been damaged and the extent to which they have sustained damages, and what is the proper measure of those damages.

21. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as individual damages may be relatively small for most members of the Class, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the Class would prosecute individual actions.

Plaintiff anticipates no difficulty in the management of this action as a class action. Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying results, which may establish incompatible standards of conduct for defendants.

## SUBSTANTIVE ALLEGATIONS

**Background**

22. Inktomi was originally established as a Web search services provider. However, beginning in 1996, the Company expanded its product offerings to provide additional network infrastructure applications in response to the late-90's Internet boom. As a result, in January 2002 the Company had three main product and service offerings: (i) Web search services ("Web Search"); (ii) content networking products; and (iii) enterprise search software.

23. In January 2002, Vishal Makhijani ("Makhijani"), Inktomi's Vice President and General Manager of Web Search, met with Yahoo officials to discuss the possibility of entering into a business relationship regarding web search services. From time to time over the next two months, Makhijani and other members of Inktomi's Web Search team met with Yahoo representatives to discuss a possible commercial agreement.

24. In April 2002, Defendant Peterschmidt spoke with Terry Semel ("Semel"), Chairman and Chief Executive Officer of Yahoo, regarding the possibility of entering into a web search services agreement.

25. In July 2002, Inktomi continued its discussions with Yahoo regarding a commercial agreement to provide web search services. The discussions had advanced to a stage where the parties began to exchange drafts of commercial agreements.

**Inktomi Implements Strategy to Sell Each Division of the Company Separately**

26. Also in July 2002, Inktomi announced that, in an effort to return to profitability, it would focus its business on Web Search. This began a process that would ultimately produce separate agreements with Satyam Computer Services Ltd., announced in October 2002, and Verity Inc. ("Verity") announced in November 2002. These agreements resulted in the winding up of the content networking products line (with expected revenue and expenses for this product line to decline to zero by the end of 2003) and the divestiture of the enterprise search division.

27. Beginning in October 2002, likely due to Inktomi's announcement that it would focus its future business on web search, Yahoo's focus shifted from a commercial agreement with Inktomi to an acquisition of Inktomi.

28. Discussions ensued in the first three weeks of October between Yahoo and Timothy J. Stevens ("Stevens"), Inktomi's Senior Vice President of Business Development, regarding Yahoo's interest in exploring a possible business combination.

29. On October 23, 2002, Semel telephoned Defendant Peterschmidt and communicated directly to Peterschmidt Yahoo's interest in exploring a possible acquisition of Inktomi.

30. On October 28, 2002, representatives of Inktomi, including Defendant Peterschmidt, Defendant Brewer, Stevens and Makhijani, met with Yahoo representatives to discuss each company's business strategies and objectives. The parties agreed that, regardless of the form of business relationship or transaction they might ultimately agree to, it would be helpful for Yahoo to have a better understanding of Inktomi's technical and business capabilities in the web search area.

31. After several meetings between officials of Yahoo and Inktomi, and after reviewing Inktomi's commercial contract proposal, Semel telephoned Peterschmidt directly on November 11, 2002 and informed him that Yahoo still wanted to pursue an acquisition of Inktomi. Peterschmidt indicated that Inktomi management would be willing to consider an acquisition proposal and suggested that Yahoo representatives follow up with Stevens.

32. On November 13, 2002, Inktomi and Verity jointly announced that the Company had entered into an agreement to sell its enterprise search software business to Verity. As a result of this agreement, combined with the earlier agreement to divest its content networking products business, Inktomi was essentially a web search business.

33. Yahoo was not the only potential acquiror of Inktomi's remaining web search business, however. Inktomi disclosed in its Schedule 14A, filed with the SEC on January 10, 2003, ("Proxy Statement") that from time to time during 2001 and 2002, Defendant Peterschmidt and other senior members of Inktomi had engaged in preliminary discussions with several other parties concerning possible business combinations or other strategic transactions. Inktomi engaged in substantial negotiations with two of these parties, executed confidentiality agreements and provided non-public

information to these parties, and allowed these parties to hold due diligence discussions with management and other Inktomi representatives. In connection with these discussions, Inktomi retained "nationally recognized investment banks" to act as its financial advisors.

34. One of these companies, which defendants have only identified as Company X, was interested in Inktomi's Web Search business. Prior to Inktomi's agreement with Verity on November 13, 2002, Company X made "several proposals" to acquire Inktomi, none of which resulted in an agreement on structure or valuation. Defendants have not disclosed the terms of these proposals or the identity of the financial advisor engaged to evaluate these proposals to its shareholders.

35. Inktomi continued to engage in discussions with Yahoo and Company X regarding Inktomi's web search business after the Verity transaction was announced. On November 14, 2002, the Chief Executive Officer of Company X contacted Peterschmidt and indicated that Company X remained interested in a possible acquisition of Inktomi. On November 19, 2002, representatives of Company X and Inktomi, including, *inter alia,* Peterschmidt, met to discuss the possibility of an acquisition by Company X, including the potential terms of such a transaction.

36. Also on November 19, Stevens contacted Yahoo and indicated that Inktomi was considering strategic alternatives. Following this conversation, Yahoo delivered a due diligence request list and Yahoo's representatives and legal and financial advisors were granted access to a data room and began to conduct extensive due diligence meetings and reviews.

37. On November 20, 2002, Inktomi retained Thomas Weisel Partners ("Thomas Weisel") as Inktomi's exclusive financial advisor in connection with the potential sale of the Company. Defendants did not disclose whether Thomas Weisel was one of the financial advisors previously retained to evaluate prior business combinations including, *inter alia,* Company X's numerous proposals. However, Defendants did disclose in the Proxy Statement that a majority of Thomas Weisel's fee was contingent upon the consummation of "the" merger, and further that Thomas Weisel has previously performed various investment banking services for Inktomi ***and Yahoo***, for which it received customary fees. Additionally, ***the Proxy Statement disclosed that Timothy Koogle, who is the former Chairman and Chief Executive Officer of Yahoo and who continues to serve as a director of Yahoo, is a member of Thomas Weisel's Advisory Board.***

38. According to the Proxy Statement, negotiations between Inktomi and both Yahoo and Company X continued over the course of the next several weeks. At a telephonic board meeting held on December 18, 2002, Peterschmidt reviewed with the board the discussions with Yahoo, which had resulted in an offer from Yahoo of $1.65 per share. Peterschmidt also advised the board that Company X had not submitted a proposal and that, based on his conversation with the Chief Executive Officer of Company X earlier that day, he did not expect it to do so.

39. Following the board meeting on December 18, 2002, one day after the sale of Inktomi's enterprise search business to Verity was completed, Inktomi entered into an exclusivity agreement with Yahoo providing that Inktomi would negotiate exclusively with Yahoo through 9:00 a.m. (PST) on December 25, 2002 regarding a potential acquisition of Inktomi by Yahoo (the "Exclusivity Agreement").

40. Following a board meeting on December 22, 2002, Inktomi finalized and executed (1) the Merger Agreement, pursuant to which Yahoo agreed to pay $235 million, or $1.65 per share, to purchase the Company; (2) a portal services agreement, which would act as a commercial agreement in the event that the Merger Agreement was not consummated; (3) voting agreements with Defendants Peterschmidt and Brewer by which both agreed to vote their shares of Inktomi in favor of the Merger Agreement; and (4) an agreement with respect to certain non-competition obligations.

**Thomas Weisel's Conflict of Interest**

41. As alleged, Thomas Weisel had a substantial conflict of interest in providing advice to Inktomi in conjunction with deciding whether Inktomi should be sold at all and, if so, to whom. Thomas Weisel had earlier done substantial work for Yahoo, and a member of Thomas Weisel's Advisory Board, Timothy Koogle, is Yahoo's former Chairman and Chief Executive Officer and continues to serve as a Yahoo director. Thus, Defendants' decision to retain Thomas Weisel to render a fairness opinion regarding an offer to sell the Company to Yahoo is suspect at best. Further, while Defendants do not disclose the full nature of Thomas Weisel's compensation in this matter, Defendants do disclose that the majority of this compensation is contingent upon the consummation of the merger. As a result, Thomas Weisel has strong business ties to Yahoo and a strong financial incentive to recommend the sale of the Company. Additional amounts Thomas Weisel might have been paid if it

had recommended Inktomi remain independent have never been disclosed to Inktomi's public shareholders.

**Inktomi's Directors and Officers Stand to Reap Enormous Profits as a Result of this Transaction Which Were Not Shared Equally with the Minority Shareholders**

42. As noted above, many of Inktomi's senior officers and each and every member of its Board of Directors stand to receive compensation, in the form of cash payments and/or indemnification agreements, beyond what the public shareholders will receive in connection with the Merger Agreement, as follows:

a. Indemnification - The Merger Agreement provides that Inktomi's officers and directors will have rights to indemnification for acts or omissions occurring prior to the consummation of the Merger Agreement (the "Effective Time") for six years after the Effective Time - thereby insulating them from all liability arising from this transaction;

b. Assumption of Stock Options - Under the terms of the Merger Agreement, at the Effective Time, each stock option granted under the Company's stock option plans will be assumed by Yahoo and converted into an option to acquire shares of Yahoo common stock. Thus, each of the Individual Defendants who own Inktomi options (defendants Peterschmidt, Brewer and Myers) will have the opportunity to own an equivalent interest in Yahoo and will avoid the adverse tax consequences that Inktomi's public shareholders will suffer when their Inktomi shares are converted to cash.

c. Retention Agreements - Each of Inktomi's executive officers (including Defendants Peterschmidt and Brewer) have entered into a Management Retention and Change of Control Agreement that provides for full vesting of all outstanding options and restricted stock in the event that such executive officer's employment is constructively terminated within 12 months of a change of control of Inktomi. Additionally, the Inktomi Corporation Retention and Change of Control Severance Benefits Plan provides for payment of up to two years' severance and bonus pay in the event of termination without good cause or voluntary termination by the executive for good reason within 12 months of a change of control of Inktomi. In its most recent proxy statement, filed with the SEC on January 24, 2003, Inktomi estimates that if the merger occurred in the first quarter of the 2003 calendar

year and the employment of all the executive officers were terminated without cause immediately following the merger by the surviving corporation, the total severance payments and the estimated cost of group employee benefit coverage, respectively, would be approximately as follows: Defendant Brewer, $330,000 and $0; Randy S. Gottfried, $792,000 and $9,264; Vishal Makhijani, $660,000 and $9,264; Defendant Peterschmidt, $1,600,000 and $16,542; and Timothy J. Stevens, $858,000 and $22,716. Such estimated payments do not include any additional "gross-up" amounts described above that may become payable in the event the severance payments constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code and are subject to the excise tax imposed by Section 4999 of the Internal Revenue Code.

d. Employment Arrangements - Defendant Brewer is expected to join Yahoo following completion of the Merger.

43. Because of these financial incentives, each of the Individual Defendants had a conflict of interest in deciding whether Inktomi should be sold at all, and if sold, to whom.

**Breach of Fiduciary Duty**

44. The above facts illustrate a clear conflict of interest between the personal interest of the Board and the Board's fiduciary duty of loyalty and due care to Inktomi's public stockholders, particularly in that each and every member of Inktomi's Board of Directors stand to personally profit from the transaction. If the Board had not acted in violation of its duties of loyalty and due care, the Board would have actively considered allowing Inktomi to remain independent, negotiated with other bidders, including, *inter alia,* Company X, and hired a financial advisor that did not have significant business ties to Yahoo. This is a violation of the duties of loyalty and due care to Inktomi's public shareholders on the part of each of the Individual Defendants.

45. Rather than allowing the market to value Inktomi as a going concern based on its new business model, the Individual Defendants caused Inktomi to enter into the Exclusivity Agreement, and subsequently the Merger Agreement, a deal which grants the Individual Defendants significant benefits not shared by the Company's public shareholders, the day after Inktomi's agreement to sell its enterprise search business to Verity was consummated. Defendants further foreclosed any unsolicited bids by third parties by agreeing to pay an $11.2 million termination fee to Yahoo in a variety of

circumstances. Most notably, the termination fee grants Yahoo the right to terminate the agreement and collect the $11.2 million fee if Inktomi's board so much as recommends a competing takeover proposal.

46. The Individual Defendants have breached their fiduciary duties by reason of the acts and transactions complained of herein, including, but not limited to, (1) their decision to sell the Company to Yahoo without the requisite effort to obtain the best offer possible for shareholders; (2) their decision to enter into the Merger Agreement without attempting to negotiate with third parties; (3) their retention of a financial advisor with substantial ties to Yahoo; (4) their inclusion of defensive provisions in the Merger Agreement, including an $11.2 million termination fee, which effectively prevent a superior bid from succeeding; and (5) their inclusion of provisions which benefit the Individual Defendants to the exclusion of the public shareholders.

47. The consideration to be paid to Class members in the proposed merger is unfair and inadequate because, *inter alia*:

a. the intrinsic value of Inktomi's common stock is in excess of the amount offered by Yahoo, giving due consideration to Inktomi's business and value to Yahoo; and

b. the price to be paid for Inktomi shares is not the result of an appropriate consideration of the value of Inktomi because the Individual Defendants approved the Merger Agreement without undertaking steps to accurately ascertain Inktomi's value through open bidding. By entering the Merger Agreement without actively negotiating and by providing for an $11.2 million termination fee in the event that the Merger Agreement does not close, the Individual Defendants have allowed the price of Inktomi stock to be capped, thereby depriving plaintiff and the Class of the opportunity to realize any increase in the value of Inktomi shares. Despite the long-term value of the Inktomi acquisition for Yahoo and the immediate gains received by the Individual Defendants, Inktomi public shareholders will be receiving an inadequate takeover premium, and inadequate value given the true value of Inktomi.

48. The terms of the Merger Agreement are grossly unfair to the Class, and the unfairness is compounded by the gross disparity between the knowledge and information possessed by the Individual Defendants by virtue of their positions of control of Inktomi and that possessed by Inktomi's public shareholders. Defendants' intent is to take advantage of this disparity and to compel class

members to relinquish their Inktomi shares in the merger at an unfair price on the basis of incomplete or inadequate information.

49. As a result of the breach of fiduciary duties by the Individual Defendants complained of herein, plaintiff and other members of the Class have been and will be damaged in that they have not and will not receive their fair proportion of the value of Inktomi's assets and business, will be divested from their right to share in Inktomi's future growth and development, and have been and will be prevented from obtaining a fair and adequate price for their shares of Inktomi common stock.

50. By reason of the foregoing, plaintiff and each member of the Class is suffering irreparable injury and damages.

51. Plaintiff and other members of the class have no adequate remedy at law.

52. Consequently, absent the intervention of this Court, plaintiff and members of the Class will suffer irreparable harm in that they will be forever deprived of their interest in Inktomi and will be so deprived without having the opportunity to cast an informed vote.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**

53. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

54. By reason of the foregoing, the defendants have breached their fiduciary duties to plaintiff and the Class or aided and abetted in the breach of those fiduciary duties.

55. As a result, plaintiff and the Class have been harmed.

**COUNT II**
**FAILURE TO DISCLOSE**

56. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

57. The defendants have breached their duty of full and fair disclosure to plaintiff and the Class by failing to disclose, *inter alia*:

a. the details of all discussions between Company X and Inktomi regarding the purchase of Inktomi or its Web Search business, including the date and terms of all proposals received in 2001 or 2002 and the potential terms of the possible acquisition discussed in November 2002;

b. the names of all financial advisors retained by Inktomi in connection with potential business combinations between Inktomi and, *inter alia*, Company X in 2001 and 2002 and why Thomas Weisel was chosen to evaluate the Yahoo transaction;

c. the reasons why Inktomi granted the Exclusivity Agreement to Yahoo on December 18, 2002 despite Company X's continued due diligence efforts;

d. the full consideration received by Defendants Peterschmidt and Brewer in exchange for their entering into a Voting Agreement to vote their shares of Inktomi stock in favor of the Merger Agreement;

e. any additional amounts Thomas Weisel might have been paid by Inktomi if it had recommended Inktomi remain independent; and

f. the true nature of Thomas Weisel's relationship and past business dealings with Yahoo.

58. As a result, plaintiff and the Class have been harmed.

## COUNT III
## INDEMNIFICATION

59. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

60. The defendants breached their fiduciary duty of care to the shareholders of Inktomi.

61. Plaintiff and members of the class, as shareholders of Inktomi, have been harmed by reason of the defendants' breaches of their fiduciary duty.

62. As a result, defendants should be required to indemnify plaintiff and members of the class.

## PRAYER

**WHEREFORE,** plaintiff demands judgment as follows:

1. determining that this action is a proper class action, and that plaintiff is a proper class representative;

2. declaring that defendants have breached their fiduciary duties to plaintiff and the Class and/or aided and abetted such breaches;

3. declaring that defendants have breached their duty of full and fair disclosure to plaintiff and the Class;

4. requiring defendants to indemnify the shareholders of Inktomi for breach of fiduciary duty;

5. enjoining the Merger Agreement and, if the Merger Agreement is consummated, rescinding it;

6. requiring defendants to make corrective and complete disclosures to plaintiff and the Class;

7. awarding plaintiff and the Class compensatory and/or rescissory damages as allowed by law;

8. awarding interest, attorney's fees, expert fees and other costs, in an amount to be determined; and

9. granting such other relief as the Court may find just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2003

Michael D. Braun (167416)
Timothy J. Burke (181866)
STULL, STULL & BRODY

By: [signature]
Timothy J. Burke
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468
Fax: (310) 209-2087

Richard B. Brualdi
Kevin T. O'Brien
THE BRUALDI LAW FIRM
29 Broadway
Suite 1515
New York, New York 10006
Tel: (212) 952-0602
Fax: (212) 952-0608

Attorneys for Plaintiff

Exhibit B

# NOTICE OF CASE MANAGEMENT CONFERENCE

MALACHNSKI

ENDORSED FILED
SAN MATEO COUNTY

JAN 2 4 2003

Clerk of the Superior Court
By M. MARLOWE
DEPUTY CLERK

vs.

PETERSCHMIDT

Case No. CIV 428824

Date: JUN 0 5 2003

Time: 9:00 a.m.

Dept. 6 – on Tuesday & Thursday
Dept. 21 – on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1. In accordance with applicable California Rules of Court and Local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:
   a. Serve all named defendants and file proofs of service on those defendants with the court within 60 days of filing the complaint (CRC 201.7).
   b. Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.
   c. **File and serve** a completed Case Management Statement at least **15 days** before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.
   d. **Meet and confer**, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than **30 days** before the date set for the Case Management Conference.

2. **If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order To Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.**

3. Continuances of case management conferences are highly disfavored unless good cause is shown.
4. Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation To ADR and Proposed Order (see attached form.). If plaintiff files a Stipulation To ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) **10 days** prior to the first scheduled case management conference, the case management conference will be continued for 90 days to allow parties time to complete their ADR session. The court will notify parties of their new case management conference date.
5. If you have filed a default or a judgment has been entered, your case is not automatically taken off the Case Management Conference Calendar. If "Does", "Roes", etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.
6. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.
7. The Case Management judge will issue orders at the conclusion of the conference that may include:
   a. Referring parties to voluntary ADR and setting an ADR completion date;
   b. Dismissing or severing claims or parties;
   c. Setting a trial date.
8. The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court website at www.sanmateocourt.org.

* Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least 5 business days prior to the scheduled conference (see attached CourtCall information).